**FILED**
AUG 1 4 2007  NF
AUG 14 2007  MR
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LAURA SPOTTISWOOD, INDIVIDUALLY, EX REL. THE UNITED STATES OF AMERICA and THE STATE OF ILLINOIS,<br><br>Relator,<br><br>vs.<br><br>CHEMED CORPORATION f/d/b/a VITAS HOSPICE SERVICES, L.L.C. and VITAS HEALTHCARE CORPORATION<br><br>Defendants. | 07CV 4566<br>JUDGE HOLDERMAN<br>MAGISTRATE JUDGE KEYS<br><br>JURY DEMAND<br><br>UNDER SEAL |

## COMPLAINT

Now comes the Relator, LAURA SPOTTISWOOD, Individually, and on behalf of the UNITED STATES OF AMERICA and THE STATE OF ILLINOIS ("Relator"), by and through her attorney, Sidney R. Berger, and complaining of the Defendants CHEMED CORPORATION f/d/b/a VITAS HOSPICE SERVICES, L.L.C. and Vitas Healthcare Corporation (collectively referenced herein as "Vitas"), states as follows:

### Jurisdiction and Venue

1. The court has jurisdiction over this action pursuant to 31 U.S.C § 3732 (A) and 28 U.S.C. § 1345.

2. Venue is proper in this district pursuant to 31 U.S.C. § 3732 (a).

### Parties

3. Relator is a resident of Cook County, Illinois. She is a registered nurse and has been involved in various health care related areas for over the past twenty years.

1

Relator was employed at the Matteson office of Vitas during 2001 and 2002. Many of the facts alleged hereinafter are based Relator's personal observation and independent knowledge.

4. Upon information and belief, Chemed Corporation is a corporation formed in 2003 upon the merger of Vitas Hospice Services, L.L.C. and Roto Rooter, Inc. Chemed presently conducts business through these two wholly owned subsidiaries.

5. Vitas Healthcare Corporation is the leading provider of end of life care in the United States. Vitas Healthcare Corporation operates 42 hospice programs in 16 states, including, the State of Illinois.

**Factual Background**

6. The United States Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services ("CMS"), administers and supervises the Medicare program. The Medicare program was established to pay for the costs of certain health care expenses for individuals, generally 65 years of age and older, pursuant to the Social Security Act. "Part A" of the Medicare program covers hospice care for eligible individuals.

7. Hospice care is an approach to treatment that recognizes that the impending death of an individual warranted a change in focus from curative care to palliative care. Hospice care is intended to improve or maintain the patient's quality of life, focusing on pain and symptom control and psychosocial needs of the patient and the patient's family. A hospice is supposed to use an interdisciplinary approach to deliver medical, social, psychological, emotional and spiritual services though the use of a broad

spectrum of professional and other care-givers with the goal of making the individual as physically and emotionally comfortable as possible.

8. The majority of hospice patients are cared for in their own homes. Hospice care may also be provided to patients residing in nursing homes.

9. Approximately 90 percent of all hospice care costs for services provided in the United States are billed to, and paid by, Medicare.

10. A hospice could not receive reimbursement from Medicare for hospice care provided to Medicare beneficiaries until the hospice had been certified under Medicare. In order to obtain such certification, a hospice and all hospice employees had to be licensed in accordance with applicable federal, state and local law and regulations.

11. One of the requirements for Medicare certification is that the majority of hospice services provided are performed by employees of the hospice as opposed to outside contractors.

12. An individual entitled to benefits under Medicare Part A is eligible to elect hospice care if the individual was certified as being terminally ill with a life expectancy of six months or less to live (if the terminal illness ran its normal course).

13. An eligible Medicare beneficiary may receive hospice care for two 90-day benefit periods, followed by an unlimited number of 60-day periods. The patient has to be certified in writing as terminally ill (as defined above) at the beginning of each period by the hospice medical director or physician member of the interdisciplinary team caring for the patient. At the beginning of the first period of benefits, the patient also had to be certified as terminally ill by the patient's attending physician.

14. Medicare provides a fixed payment to a hospice for each day that a patient is eligible and under the care of the hospice regardless of the amount of services furnished on any given day. Therefore, a hospice does not bill Medicare for particular services provided to a patient but rather receives a fixed sum to cover all services for the patient, whether they cost more or less than the fixed amount paid by Medicare. The amount of the fixed daily payment is determined by the type of care provided to the hospice patient. There were four types of care which may be provided; namely, routine home care, continuous home care (crisis care), inpatient respite care, or general inpatient care.

15. Approximately 95 percent of the total number of days hospice care is provided in the United States is at the routine home care level. During the 2006 calendar year, Medicare reimbursed hospices at the rate $126.49 per day for routine home care. Routine home care is the lowest rate of reimbursement for hospice services.

16. The highest hospice reimbursement by Medicare is for continuous home care. During the 2006 calendar year, Medicare, on the average, reimbursed up to $738.26 per day ($30.76 per hour for 24 hours). Continuous care may be Medicare covered in times of crisis which is defined as a period in which the beneficiary requires continuous care to achieve palliation or management of acute medical symptoms (C.F.R. § 418.204 (a)).

17. Continuous care coverage allows for reimbursement for as little as 8 hours or as much as 24 hours per day and covers both nursing care and home health aide services. However, in order to be Medicare reimbursable, the care provided in any such 24 hour period must be predominantly nursing care (C.F.R. Section § 418.302 (b)(2)).

4

18. Medicare coverage for continuous care was not intended to extend for long periods of time, as it is properly reimbursable by Medicare solely when a hospice patient is in "crisis" predominately needing nursing care over at least an 8 hour period.

19. During the calendar year 2005 (the last year for which Realtor was able to obtain statistics prior the filing of this Complaint), the number of days for which hospice providers billed Medicare for having provided continuous care services, was but one half of one percent (0.5%)of the total number of days for which hospice care was provided.

20. Under the Medicaid Act, the United States Department of Health and Human Services shares with each state the cost of medical services to families with dependent children and aged, blind, or disabled individuals whose income and other financial and economic resources were insufficient to allow them to meet the cost of necessary medical services. The Medicaid Act requires each state to promulgate a plan for medical assistance and administer its own Medicaid program. The State of Illinois enacted such a program which was administered by the Illinois Department of Public Aid ("IDPA").

21. When an individual resides in a nursing home in a "Medicaid bed", this means that Medicaid was paying the nursing home expenses for the individual. If such an individual elected hospice, the hospice and the nursing facility had to enter into a written agreement under which the hospice took full responsibility for the professional management of the individual's hospice and care, and the nursing home agreed to provide room and board to the individual. The hospice patient then remained in the Medicaid bed while residing in the nursing home.

22. The Medicaid program in the State of Illinois offered a Medicaid hospice benefit. Therefore, if a terminally ill person was not a Medicare beneficiary but was eligible for Medicaid assistance, the person could elect hospice benefits under Medicaid. The Medicaid hospice benefits and reimbursement amounts are identical to those under Medicare.

## Scheme to Defraud

23. In late 2001, Relator accepted employment by Vitas for the position of Registered Nurse.

24. Prior to actually beginning work, Relator went through an orientation program during which Vitas explained the Vitas "philosophy" and its commitment to its patients.

25. During orientation, Relator was told how Vitas was not only the largest hospice care provider in the United States, but that it also was the single largest provider of crisis care services. Relator was told that providing crisis care was a money losing proposition. Nevertheless, Vitas, due in its commitment to its patients, provided crisis care when warranted.

26. During her orientation, after having being told that crisis care was a money losing proposition to Vitas, Relator noted that Vitas kept a "tote board" keeping track of the numbers of patients on crisis care. The "tote board" had the numbers of patients on crisis care broken down between those residing in nursing homes and those residing in their own homes. New referrals of crisis care patients were added to the "tote board" and the Vitas employees working the "tote board" would celebrate each new referral. Relator thought it very strange that Vitas would openly keep track of the

numbers of crisis care patients, celebrating each new referral, when providing crisis care was supposedly a money losing proposition and not a money maker.

27. During orientation, Relator was informed that as part of the hospice services provided by Vitas, nurses would be visiting crisis care patients every day and routine home care two to three times per week.

28. After completing orientation, Relator began working for Vitas. In the course of her employment by Vitas, Relator had numerous occasions to visit with hospice patients both on crisis care and routine home care.

29. In visiting with the crisis care patients, Relator invariably found certain similarities; namely, a nurse's aide was sitting at the patients' bedside, the patients did not appear to be in any acute distress, and that there was very little or no nursing care actually being provided. Furthermore, Relator noted that the nurse's aides were not Vitas employees, but, rather, were hired from outside contractors who signed in for twelve hour shifts. Specifically, Relator visited the following patients on the following days and observed the following:

> a. Patient Margaret R. was visited by Relator on March 17, 2002 at home in Chicago Heights, Illinois. Margaret was admitted to Vitas Hospice on February 21, 2002 and was immediately started on crisis care. She remained on crisis care through at least March 17, 2002. At the time of Relator's visit, Margaret was living at home with her husband and two daughters. At the time of her visit, Relator observed that the crisis care worker changed Margaret's diaper, took her vitals, emptied her foley bag, and sat at her bedside. The medicine Margaret received was administered

7

by her daughters, and not the crisis care worker. Relator did not observe Margaret experiencing any acute medical symptoms nor did she observe Margaret to be in a period of "crisis" which would reasonably have required continuous care to achieve palliation. Relator personally observed the crisis workers' sign in sheets for which said workers verified their having provided crisis care services for Margaret for continuous 12 hour shifts.

  b.  Patient Earline A. was visited by Relator at her home on March 17, 2002. She was placed on Vitas crisis care on March 11, 2002. Relator observed that the crisis care worker sat at her bedside and assisted her with walking. All medications were taken orally and administered by her family members. She did not appear to be in acute distress nor did her chart indicate her having recently been in acute distress.

  c.  Patient Martha J. was visited by Relator on March 30, 2002 at the nursing home in which she resided. She was placed on 24 hour crisis care on March 26, 2002. The crisis care worker took vitals and assisted nursing home staff with changing her position. She did not appear to be in any acute distress. Nursing home staff provided all medications.

30.  After witnessing what she believed to be an ongoing pattern of fraudulent billing the government for hospice crisis care which was neither warranted nor provided in accordance with Medicare guidelines, Relator notified appropriate Governmental authorities of her concerns in March, 2002.

8

31. Although Relator has not worked at Vitas since 2002, she has recently discovered that the fraudulent actions of Vitas, as described herein, have continued to date. Despite the fact that crisis care, reimbursable under Medicare guidelines, was intended to be utilized for short periods of time to provide necessary nursing care to manage acute medical symptoms, Vitas continues to file claims with Medicare for having provided hospice services at the higher reimbursable crisis care rates, when, in fact, Vitas did not predominantly provide said patients with nursing care services nor were the patients suffering from acute medical symptoms.

32. In December 2006, Relator once again notified Government authorities to the ongoing fraud being committed by Defendants; Relator had been informed that the Government has since started investigating Vitas as to the allegations raised herein.

33. During the 2005 and 2006 calendar years combined, Vitas filed claims with, and received payments from, Medicare for over $180,000,000 for crisis care services. The numbers of days Vitas claimed to have supplied crisis care hospice services to its patients is over ten times the number of days crisis care, on the national average, would have been provided to hospice patients. There is no rational basis why Vitas crisis care claims to Medicare should be so statistically deviant from the national average of crisis care provided to hospice patients.

## Count I

### Violation of the False Claims Act, U.S.C. § 3729 (a) (1)

34. This is a civil action brought on behalf of the United States to recover treble damages and civil penalties under § 3729 (a) (1) of the False Claims Act.

35. Relator adopts and realleges paragraphs 1 through 33 as though fully set forth herein.

36. In attempting to maximize the amount of hospice payments that were received from Medicare, in its normal course of business, Vitas would place patients on "crisis care" (the reimbursement for which is up to $738.26 per day) even when the billing for such care did not meet Medicare guidelines (i.e. the patient on whose behalf said care was not provided did not need "continuous care" to achieve palliation nor did acute medical symptoms exist which might have required such care.)

37. Although continuous home care reimbursable by Medicare is only to be furnished on behalf of beneficiaries during brief periods of crisis, and may be billable after having provided a minimum of 8 hours per day of such care, Vitas regularly billed Medicare for providing continuous care 24 hours per day for periods of up to 21 days and even longer. Oftentimes, the continuous care being provided amounted to nothing more than having a nurse or a nurse's aide sitting at the bedside of the hospice patient who was not experiencing any acute medical symptoms

38. In its normal course of business, Vitas would routinely submit claims to Medicare for having performed hospice crisis care services on behalf Medicare patients who do not qualify to receive said services. Example of fraudulent claims submitted by Vitas to Medicare for crisis care hospice services provided on behalf of Medicare beneficiaries who did not receive or qualify for said services are the claims submitted on behalf of Margaret R. covering the period from February 21, 2002 through at least March 17, 2002; Earline A. covering the period from March 11, 2002 through at least March 17,

10
Case 4:13-cv-00505-BCW   Document 1   Filed 08/14/07   Page 10 of 13

2002 and Martha J. covering the period from March 26, 2002 through at least March 30, 2002.

39. Upon information and belief, the allegations of fraud as set forth herein, are not relegated solely to the services Vitas performed in this District, but, instead, was in accordance with its national policy of operations.

40. Defendant Vitas acted knowingly – that is Vitas possessed actual knowledge that many of the claims it was filing for having provided hospice care were false and fraudulent in that many of its patients did not qualify for the degree of care (continuous care) being billed nor did Vitas actually provide "crisis care" as mandated by Medicare guidelines (primarily nursing care); Vitas acted in deliberate ignorance of the falsity of its claims; or Vitas acted in reckless disregard of the falsity of its claims.

41. Under the False Claims Act, Defendants are liable for three times the amount of damages plus a civil penalty for each false claim filed under the circumstances set forth herein.

WHEREFORE, Relator prays that judgment be entered in its favor against the Defendants, and each of them, in an amount equal to three times the damages proven at trial together with a fine not to exceed $11,000.00 for each claim filed under the circumstances set forth herein, together with the costs and attorneys' fees as provided for by Statute.

## Count II

### Defendants' Violations of State of Illinois Whistleblower Reward and Protection Act 740 ILCS 175/3

42. This is a civil action brought by Relator to recover treble damages and civil penalties under Section 740 ILCS 175/3 of the Whistleblower Reward and Protection Act.

43. Relator repeats and realleges the allegations in paragraphs 1-33, above, as though fully set forth herein.

44. Vitas filed claims with Medicaid for having provided hospice care on behalf of patients which they knew were false and fraudulent in that patients on whose behalf claims were filed were not Medicaid eligible to receive the degree of hospice care (continuous care) under which Vitas oftentimes filed claims. Furthermore, when Vitas purported to provide continuous care on behalf of patients Medicaid eligible to receive said care it was not primarily nursing care.

45. The claims presented by Vitas under the circumstances set forth herein are false and fraudulent. Under the law, the Defendants, and each of them, are liable to the State of Illinois for the false claims presented.

46. By reason of the false claims presented or caused to be presented by Defendants, the State of Illinois has incurred damages to be proven at trial. Defendants are liable, under the Whistleblower Reward and Protection Act, for three times the amount of the damages incurred by the State of Illinois plus a civil penalty for each false claim filed, plus attorney's fees and costs.

WHEREFORE, Relator demands and prays that judgment be entered against the Defendants, and each of them, for triple the amount of false claims filed by Vitas, that the maximum civil penalty be assessed against each of the Defendants for each false claim

12
Case 4:13-cv-00505-BCW   Document 1   Filed 08/14/07   Page 12 of 13

they caused to be filed, that the Defendants be assessed attorney's fees and the costs of this action, and for such other relief as may be appropriate and just.

/s/ Sidney R. Berger
Attorney for Relator

SIDNEY R. BERGER
THREE FIRST NATIONAL PLAZA
SUITE 3700
CHICAGO, ILLINOIS 60602
(312) 558-6730
Atty. I.D. - 52211