IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and | ) | |
| STATE OF ILLINOIS, *ex rel.* | ) | |
| LAURA SPOTTISWOOD, | ) | |
| | ) | No. 07 C 4566 |
| Relator-Plaintiff, | ) | |
| | ) | The Honorable Sharon Johnson Coleman |
| v. | ) | |
| | ) | Magistrate Judge Arlander Keys |
| CHEMED CORPORATION f/d/b/a VITAS | ) | |
| HOSPICE SERVICES, L.L.C. and VITAS | ) | |
| HEALTHCARE CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

FIRST AMENDED COMPLAINT

Relator, Laura Spottiswood, on behalf of the United States of America and the State of

Illinois, by and through her attorneys and complaining of the defendants, Chemed Corporation,

f/d/b/a Vitas Healthcare Corporation and Vitas Hospice Services, L.L.C., states as follows.

INTRODUCTION

1.   Relator, Laura Spottiswood, brings this action on behalf of the United States of

America and the State of Illinois for treble damages, civil penalties, and other relief, based upon

defendants' violations of the False Claims Act, 31 U.S.C. §3729 *et seq.*, and the Illinois False

Claims Act (formerly the Illinois Whistleblower Reward and Protection Act), 740 ILCS §175 *et*

*seq.*

2.   As described in detail in this complaint, defendants Chemed Corporation f/d/b/a

Vitas Healthcare Corporation and Vitas Hospice Services, L.L.C. defrauded the United States

and the State of Illinois by submitting false claims with respect to the provision of continuous home care under the Medicare and Medicaid hospice benefit programs. Specifically, defendants filed false claims for providing hospice services at the continuous home care rate (which in 2012 was over $730 higher per day than the rate for routine home care) despite the fact that the patients did not require and/or defendants did not provide continuous home care services.

3. By engaging in this fraud, defendants were able to reap large and unwarranted profits over and above those they were entitled to given the condition of the patients' health and the actual services provided to them.

4. The violations alleged herein all occurred on an ongoing and continuing basis up to and including the date of the filing of this lawsuit and, on information and belief, are continuing to this day.

## JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1367, as well as 31 U.S.C. §3730. This Court also has jurisdiction pursuant to 28 U.S.C. §1345, which provides the district courts with original jurisdiction over all civil actions commenced by the United States of America. Under 31 U.S.C. §3732(b) this Court has jurisdiction over relator's claims raised on behalf of the State of Illinois under the Illinois False Claims Act, as they arise from the same transactions or occurrences as her claims brought under the False Claims Act.

6. Venue is proper in the Northern District of Illinois pursuant to 31 U.S.C. §3732(a) and 28 U.S.C. §1391(b) because defendants can be found, reside, and/or transact business in this District and acts alleged herein occurred in this District.

7. Relator has direct and independent knowledge of the information upon which these allegations are based and she voluntarily provided the information to both the United States and

the State of Illinois before filing these claims. Further, the allegations and transactions upon which this action is based have not been publicly disclosed.

## PARTIES

### Relator

8. Relator has been a registered nurse for approximately 32 years and has experience with the provision of hospice services covered by Medicare and Medicaid.

9. Relator was hired by Vitas Healthcare Corporation as a registered nurse in December 2001 and worked part-time for Vitas until she quit in July 2002. During that period, she was the Assistant Nursing Director for the Cook County Department of Public Health's Bridgeview office and also worked part-time at Loyola Home Care and Hospice.

10. In 2006, relator was employed as a Nurse Consultant for the Centers for Medicare and Medicaid Services, where she reviewed and evaluated the quality of health care in the United States Department of Health and Human Service's Region V, monitored and evaluated state enforcement of health and safety standards for long-term care facilities, and evaluated state agency interpretation of regulations and enforcement of Medicare and Medicaid standards.

11. In August, 2009, relator became a Health Quality Review Specialist at the Centers for Medicare and Medicaid Services. Her responsibilities included on-site federal monitoring surveys of health-care providers for compliance with the Medicare requirements for certification and conditions of participation, monitoring and evaluating state enforcement of health and safety standards for long-term care facilities, and recommending appropriate enforcement action against federally-certified providers and suppliers.

12. In September 2011, relator was hired by the Department of Veterans Affairs as a Health Systems Specialist in the Office of Inspector General. Her duties and responsibilities

include the inspection of individual health-care issues, performing quality of program assistance

reviews of medical center operations, the evaluation of nationwide health-care programs, and

providing clinical consultation to enhance patient care programs to prevent and deter fraud,

waste, and abuse.  Relator is currently employed with the V.A.

Defendants

13.  Vitas Healthcare Corporation and Roto-Rooter, Inc. are wholly-owned subsidiaries

of Chemed Corporation.  Chemed obtained 100% ownership of Vitas Healthcare Corporation in

2004.

14.  Vitas Healthcare Corporation began operation in Florida in 1978.  Vitas Hospice

Services, L.L.C. is a wholly-owned subsidiary of Vitas Healthcare Corporation (defendants are

hereafter referred to collectively as "Vitas").

15.  Vitas markets itself as the nation's "largest" and "leading provider of end-of life

care."  It currently operates in 15 states, including Illinois.

VITAS' FRAUD

Medicare and Medicaid Hospice Benefit Programs

16.  The Medicare program was established to pay for the costs of certain health care

expenses for individuals, generally 65 years of age and older, pursuant to the Social Security Act.

"Part A" of the Medicare program covers hospice care for eligible individuals.

17.  The United States Department of Health and Human Services, through its agency,

the Center for Medicare and Medicaid Services ("CMS"), administers and supervises the

Medicare program.

18.  Hospice care is an approach to treatment that recognizes that the impending death of an individual warrants a change from curative care to palliative care.  Hospice care is intended to improve or maintain the patient's quality of life, focusing on pain and symptom control and the psychosocial needs of the patient and the patient's family.

19.  A hospice uses an interdisciplinary approach to deliver medical, social, psychological, emotional, and spiritual services through the use of a broad spectrum of professional and other caregivers, with the goal of making the individual as physically and emotionally comfortable as possible.

20.  The majority of hospice patients are cared for in their own homes.  Hospice care may also be provided to patients residing in a nursing home.

21.  Approximately 89% of all costs for hospice care services provided in the United States are billed to, and paid for by, Medicare.  Medicaid pays for approximately an additional 4% of all such services.

22.  Medicare hospice spending has increased from $2.9 billion in 2000 to $13 billion in 2010.

23.  A hospice cannot receive reimbursement from Medicare for hospice care until it has been certified under Medicare.  In order to obtain such certification, a hospice and all hospice employees must be licensed in accordance with applicable federal, state and local law, and regulations.

24.  A qualified "provider of services" is entitled to reimbursement for hospice services provided to "terminally-ill" individuals under Medicare Part A.  42 U.S.C. §1395cc; 42 C.F.R. §§418.20, 418.200.

25.  A patient is "terminally ill" if the patient's "prognosis is for a life expectancy of 6 months or less if the terminal illness runs its normal course."  42 C.F.R. §418.22(b)(l).

26.  An eligible Medicare beneficiary may receive hospice care for two 90-day benefit periods, followed by an unlimited number of 60-day periods.  *Id.*, §418.21(a).

27.  At the beginning of each benefit period, and before submitting a claim for payment, the patient must be certified in writing as terminally ill by the hospice medical director or physician member of the interdisciplinary team caring for the patient.  *Id.*, §418.22.  At the beginning of the initial period, the patient also must be certified as terminally ill by the patient's attending physician, if any.  *Id.*, §418.22(c)(1)(ii).  Such certifications must be contained in the patient's medical record.  *Id.*, §418.22(d).  Additionally, before hospice services are provided a plan of care must be established (and then periodically reviewed and revised, as required) by the attending physician, the medical director, and the hospice's interdisciplinary group.  *Id.*, §418.56.  All resulting services must be consistent with this plan of care.  *Id.*, §418.56.  Payment for the hospice services will not be provided by Medicare if these requirements are not met.  42 U.S.C. §1395f(a)(7); 42 C.F.R. §418.200.

28.  Furthermore, hospice services that are not "reasonable and necessary for the palliation and management of terminal illness" are specifically excluded from Medicare coverage.  42 U.S.C. §1395y(a)(1)(C); 42 C.F.R. §418.200.

29.  Under the Medicaid Act, the United States Department of Health and Human Services shares with each state the cost of medical services provided to families with dependent children and aged, blind, or disabled individuals whose income and other financial and economic resources are insufficient to allow them to meet the cost of necessary medical services.

30.  The Medicaid Act requires each state to promulgate a plan for medical assistance and administer its own Medicaid program.  The State of Illinois enacted such a program, which is administered by the Illinois Department of Healthcare and Family Services (formerly the Illinois Department of Public Aid).

31. The Medicaid program in the State of Illinois offers a Medicaid hospice benefit. Therefore, if a terminally ill person is not a Medicare beneficiary but is eligible for Medicaid assistance, the person may elect hospice benefits under Medicaid. The Medicaid hospice benefits and reimbursement amounts are identical to those under Medicare.

32. When an individual resides in a nursing home in a "Medicaid bed," this means that Medicaid will pay the nursing home expenses for the individual. If such an individual elected hospice, the hospice and the nursing facility must enter into a written agreement under which the hospice takes full responsibility for the professional management of the individual's hospice care, and the nursing home agrees to provide room and board to the individual. The hospice patient then remains in the Medicaid bed while residing in the nursing home.

Hospice Benefit Program Payments

33. Medicare provides a fixed payment to a hospice for each day that a patient is eligible and under the care of the hospice regardless of the amount of services furnished on any given day.

34. Therefore, a hospice does not bill Medicare for particular services provided to a patient but rather receives a fixed sum (either per hour or per day) to cover all services for the patient regardless of whether they cost more or less than the fixed amount paid by Medicare.

35. The amount of the fixed payment is determined by the type of care provided to the hospice patient. There are four types of care which may be provided; namely, routine home care; inpatient respite care; general inpatient care; and continuous home care (also known as "crisis care," "continuous care," or "CHC").

36. CMS establishes reimbursement rates for these four different categories of covered hospice care. 42 C.F.R. §418.302.

37. The reimbursement rate applicable to each category of care differ drastically, and continuous home care is reimbursable at a far higher rate than any other category of care. For example, the national reimbursement rates for 2004 and 2012 were as follows:

| Category of Care | Daily Rate (2004) | Daily Rate (2012) |
|---|---|---|
| Routine home care | $121.98 | $151.03 |
| Inpatient respite care | $126.18 | $156.22 |
| General inpatient care | $542.61 | $671.84 |
| Continuous home care | $711.922/ $29.66/hr. | $881.46/ $36.73/hr. |

38. As of 2010, 95.7% of the total number of hospice care patient days in the United States were at the routine home care level.

39. Routine home care is the lowest rate of reimbursement for hospice services. During 2012, Medicare reimbursed hospices at the rate $151.03 per day for routine home care.

40. As of 2010, 1.2% of the total number of hospice care patient days in the United States were at the continuous home care level.

41. Continuous home care is the highest rate of reimbursement for hospice services. During 2012, Medicare, on the average, reimbursed up to $881.46 per day ($36.73 per hour for 24 hours) for continuous home care.

42. On any day that the hospice patient is not receiving either continuous or inpatient care, the hospice is to be paid the routine home care rate. 42 C.F.R. §418.302(b)(1). The 2012 routine home care per diem rate was $730.43 *less* per day than the continuous home care rate.

43. Given the hospice patient's terminal diagnosis, both the patient and the family are usually suffering from a substantial amount of stress. This stress, often compounded by the

8

physical condition and age of the hospice patient, as well as a lack of medical sophistication on the part of the patient and his or her family, creates an environment that is ripe for abuse by unscrupulous hospice providers.

44.  This susceptibility to fraud is compounded by the fact that approximately 93% of hospice care is billed to and paid for by Medicare or Medicaid, rather than the patients themselves.  As a result, most patients and their families are not aware of, or do not understand, the level of care a hospice provider is supposed to be providing or the alleged level of hospice services for which that provider is billing Medicare.

<u>Continuous Home Care</u>

45.  The Code of Federal Regulations describes continuous home care as follows:

(a)  "A continuous home care day is a day on which an individual who has elected to receive hospice care is not in an inpatient facility and receives hospice care consisting predominately of nursing care on a continuous basis at home [or in a long-term care facility such as a nursing home].... Continuous home care is only furnished during *brief* periods of crisis as described in §418.204(a) and only as necessary to maintain the terminally ill patient at home."  42 C.F.R. §418.302(b)(2) (emphasis added).

(b)  "A period of crisis is a period in which the individual requires *continuous* care to achieve palliation and management of acute medical symptoms." *Id.,* §418.204(a) (emphasis added).

(c)  "Either homemaker or home health aide...services or both may be covered on a 24-hour continuous basis during periods of crisis but care during these periods must be predominately nursing care."  *Id.*

(d)  The direct nursing care must be provided by employees of hospice except in periods of staffing crisis when hospice has demonstrated a good-faith attempt to staff with core nursing employees.  *Id.*, §418.64.

(e)  When the patient is not an inpatient, "the hospice is paid the routine home care rate, unless the patient receives continuous care...for a period of at least 8 hours," in which case the hospice payment depends on the number of hours of continuous service provided.  "A minimum of 8 hours of care must be furnished on a particular day to qualify for the continuous home care rate."  *Id.,* §418.302(e)(3)-(4).

46. Furthermore, "it is the nature of the service, rather than the qualification of the person who provides it, that determines the coverage category of the service." *Id.*, §418.202.

47. CMS policy manuals interpret these provisions for providers and explain when they may bill for continuous home care:

(a) "[A] need for an aggregate of 8 hours of primarily nursing care [during a 24-hour day, which begins and ends at midnight] is required. The care must be predominately nursing care provided by either an RN [registered nurse], an LPN [licensed practical nurse], or an LVN [licensed vocational nurse].... This means that at least half of the hours of care are provided by an RN, LPN, or LVN." Where "there is little nursing care that requires a nurse," *(e.g.,* assisting the patient to ambulate, assisting with bathing, administering oral medications), the care does not quality as continuous home care. *Medicare Benefits Policy Manual,* "Chapter 9: Coverage of Hospice Services Under Hospital Insurance," at 40.2.1; *Medicare Claims Processing Manual,* "Chapter 11: Processing Hospice Claims," at 30.1.

(b) "When fewer than 8 hours of care are required, the services are covered as routine home care rather than continuous home care." *Medicare Benefits Policy Manual,* "Chapter 9: Coverage of Hospice Services Under Hospital Insurance," at 40.2.1.

(c) "The computation of the required 8 hours...applies only to direct patient care...." *Id.*

(d) "[A]ll nursing and aide hours should be included in the computation for [continuous home care] and when the aide hours exceed the nursing hours, [continuous home care] would be denied and routine payment will be made." *Id.*

(e) "When a hospice determines that a beneficiary meets the requirements for [continuous home care], appropriate documentation must be available to support the requirement that services provided were reasonable and necessary and were in compliance with an established plan of care in order to meet a particular crisis situation. This would include the appropriate documentation of the situation and the need for continuous care services consistent with the plan of care." *Id.*

(f) The Medicare Benefits Policy Manual provides examples illustrating the seriousness of the circumstances that may qualify as necessitating continuous home care: (1) "Frequent medication adjustment to control symptoms/collapse of family support system"; and (2) "Symptom management/rapid deterioration/imminent death." *Id.*

48.  Continuous home care is *not* appropriate: (a) for a patient who is imminently dying with no acute skilled pain or symptom management needs; (b) for caregiver breakdown with no acute skilled pain or symptom management needs for the patient; (c) for respite care; (d) for safety concerns (for example, falls, wandering, etc.) in the absence of a need for skilled interventions; or (e) as an alternative to paid caregivers or placement in another setting.

49.  All continuous home care treatment must be appropriately documented, including: (a) a physician order for the continuous home care with a diagnosis supported by a statement of symptoms (42 C.P.R. §418.25); and (b) a "plan of care," that must include a detailed statement of the scope and frequency of services necessary to meet the patient's acute medical need (*Id.,* §418.56).

50.  Pursuant to Vitas' internal policy, continuous care workers were required to document the care provided to a patient in that patient's progress notes on an hourly basis.  However, relator observed that continuous care workers instead made entries in the progress notes every two to four hours.

51.  In sum, 42 U.S.C. §1395f(a)(7), 42 U.S.C. §1395y(a)(1)(C), and 42 C.F.R. §418.200 establish that payments for hospice services, including continuous home care, will be made only if the documented services are required by an acute medical need; consistent with, or provided pursuant to, the plan of care; and once the crisis is resolved and the patient is stabilized, continuous home care must be discontinued.

52.  In order to get reimbursed by Medicare for the provision of hospice services, including continuous home care services, a hospice provider is required to submit a claim for payment to Medicare.  Specifically, a hospice provider is required to submit a HCFA-1450 form, which among other things identifies the dates and kinds of services provided and contains a

certification that the information submitted is "true, accurate and complete" and the billed-for services were "medically indicated and necessary for the health of the patient."

Relator's Employment with Vitas

53.  In November 2001, relator applied for part-time employment with Vitas.  Relator had been working part-time as an intake worker for Loyola Home Care and Hospice when her grandmother became terminally ill and she arranged for hospice care.  This was the first time that a family member of relator's had received hospice services and she was so impressed by the care provided her grandmother that she decided to seek part-time employment in a hospice program.

54.  Relator was hired to work part-time by Vitas on December 12, 2001.  Her employment with Vitas began with a one day orientation with a few other new employees at a Vitas office in Matteson, Illinois.  The orientation did not include an introduction to the various categories of hospice care, or the standards required for each category, but rather primarily covered the general history of hospice care and introduced relator to Vitas' payroll and human resources policies.

55.  Lisa Salmons, a Vitas general manager with knowledge of Vitas' policies and practices, spoke to the group about Vitas' emphasis on providing continuous nursing care at patients' homes.  According to Ms. Salmons, Vitas -- out of purported concern for the well-being of their patients and families -- provides more continuous home care services than any other hospice program even though providing such intensive services is allegedly a "money-losing proposition."  Ms. Salmons made it clear that nationwide, Vitas was the only hospice provider that provided 24-hour care.

56.  Consistent with Vitas' emphasis of continuous home care, during her orientation relator noticed that Vitas maintained a tote board in a prominent location in the office, which listed the number of patients on continuous home care as well as the Vitas division that had

signed them up. Whenever relator returned to the Matteson office during her employment with Vitas she noticed the tote board, which was constantly being updated with the names and locations of Vitas' continuous home care patients.

57. The only specifics regarding continuous home care offered by Ms. Salmons were that, in order to comply with the requirements that time billed as continuous home care be "predominantly" for the services of an RN or LPN, it is Vitas' policy to schedule continuous home care services in two 12 hour shifts, one by RNs or LPNs and the other by certified nursing assistants (CNA) or homemakers. Since the CNA or homemaker would also receive brief visits by an RN or LPN, Ms. Salmons explained that this would render the services provided by Vitas during that 24-hour period as "predominantly" by an RN and LPN and Vitas therefore could treat all care offered during the 24-hour period as continuous home care.

58. Beyond this, relator did not receive any training during the orientation regarding the specific rules and regulations governing why, when, and how the care offered by Vitas employees qualified as continuous home care. Rather, relator was educated on these issues during two weekends of on-duty training, which consisted entirely of shadowing Carol Pegg, an experienced Vitas registered nurse.

<u>Relator's Firsthand Experience with Vitas' Fraudulent Continuous Home Care Practices</u>

59. As a part of her on-duty training, relator went with Ms. Pegg on a patient visit at a nursing home. Upon arrival, based upon her health condition it was clear that the patient, Esther K., did not require continuous care to achieve palliation. Nor did she have any acute medical symptoms that required special care or pain management. Instead, relator and Ms. Pegg merely assisted a nurse's aide with the patient's personal care and taking her vitals, which did not qualify as being continuous home care services. After they left, Ms. Pegg called the Vitas office

13

to report that the patient needed to be taken off continuous home care. When relator returned to the nursing home approximately one week later, she noticed that there was no change in Esther K.'s condition (or recorded in the progress notes). Nonetheless, Esther K. remained on continuous home care.

60. During her on-duty training, relator was led to believe by a Vitas employee that certain Vitas employees received a bonus for each patient that was placed on continuous home care.

61. After completing orientation, relator began visiting patients in late December 2001. She worked two or three nights a week and alternate weekends (sometimes merely as the RN "on call" from 7:00 a.m. to 7:00 p.m.). When she was to visit patients, relator would be sent a list of patients the night before or the morning of her visits.

62. As a registered nurse, relator was assigned to visit Vitas patients and their families. For each visit, relator would review the patient file and perform a physical assessment, identify physical, psychological, social and spiritual needs, and teach pain management and dietary issues. When serving as an "on call" nurse, relator would be dispatched if there was a crisis or, far more often, simply to cover a patient when a crisis care worker had failed to show up at work.

63. During the next six months, relator visited approximately 30 patients, almost half of whom were on continuous home care. From the beginning, based on her review of the patient files, her own observations, and her conversation with nursing home staff and family members, it was clear to relator that none of her continuous home care patients were in need of, or in fact provided with, continuous home care.

64. Indeed, throughout her tenure with Vitas, relator never once requested that a patient be placed in continuous home care, as no patient she observed required it.

65. The following are summaries of relator's patients who were placed on continuous home care by Vitas:

(a) Earline A. was placed on CHC on 3/11/02 when admitted to hospice. Her diagnosis was "end stage congestive heart failure," and her chief problems were "decreased urine output, decreased appetite, weakness, sob, edema LE, chest pain." When relator visited her at home at 8:00 p.m. on 3/17/02 she was still on CHC. At the time, patient was awake, alert, and resting in bed. She did not appear to be in acute distress, nor did her chart indicate her having recently been in acute distress. Patient had an in-dwelling foley catheter and oxygen. All medications were administered orally by patient or family. According to the family, the crisis care worker sat at her bedside and assisted patient with walking. When the LPN did not show up for 8:00 p.m. shift the night before, her family was assured by Vitas that a nurse could be sent out if necessary. However, family "declined," and no nurse sent until next morning. According to the family, an RN or LPN was not necessary and if the patient got short of breath they would call 911.

(b) Eleanor B. was admitted to hospice care on 8/27/01 and she had been placed on CHC on at least five separate occasions (2/14/02, 3/19/02, 3/21/02, 4/01/02, and 4/18/02). On the last occasion, she was placed on CHC when a nurse from the nursing home called a physician and got an order for CHC due to a need for oral antibiotic and a leg wound. The continuous care order called for "oral care as needed, head of bed elevated, keep resident clean and dry, turn and reposition, vitals every shift." No new orders were entered on patient's chart. Based on the progress notes in the file, the continuous care worker did nothing for the leg wound which was covered by a small dressing. When relator visited on 4/21/02, there was no need for crisis care nursing and no Vitas crisis care staff were present. Relator called Vitas to report that no CHC worker was present and she was told that the agency staff had called off and that there was no one to send. No medications were given and no dressings were changed since patient was most recently placed on CHC. It appeared to relator that all care being provided already paid for by Medicaid, yet Medicare was also listed on Case Sheet as a payor.

(c) Lorena B. was a 40-year-old staying with her mother, with a diagnosis of brain cancer with seizures. Admitted to hospice 12/27/01, had seizure on 12/30/01, and started on CHC. Relator visited on 1/13/02 and was advised by patient's mother that there had been no other seizure activity. Nevertheless, CHC continued for another two weeks. According to CHC worker's progress notes, CHC worker took vitals, repositioned, and assisted with feeding. Patient's mother administered all medications. Patient's mother also advised relator that an RN had not

been at the house since 1/10/02. Patient had been transferred to inpatient hospice for two days, then back home on CHC. Patient's mother was unsure why she was transferred to the inpatient unit, and was told by the nurse that it was due to a billing issue.

(d)     Vivian C. had been in hospice since 10/22/00 with end-stage dementia. Patient vomited once on 3/29/02 and was put on CHC. Relator visited on 3/30/02 and there was no nausea or vomiting and the patient was able to eat without difficulty and on a regular diet for her (pureed food). Patient had no intravenous fluids (3/29/02-3/30/02). Patient ate a full lunch tray on 3/30/02. According to progress notes, CHC worker took vitals, turned and repositioned, and fed patient. Nursing home staff provided all medications. Patient remained on CHC for one to two more weeks. Stay being paid for by Medicaid. CHC paid by Medicare.

(e)     Betty H. was admitted to hospice on 2/21/02 and CHC started on 3/28/02 pursuant to physician's order due to "change of level of consciousness." Patient had been non-verbal and essentially unresponsive for more than one year. She was in a fetal position and her extremities were wrapped to prevent her from injuring herself. According to progress notes, CHC worker took vitals, turned and repositioned, and fed patient. Nursing home staff gave all medications. Patient remained on CHC for more than one week. Stay being paid for by Medicaid. CHC paid by Medicare.

(f)     Martha J. was admitted to hospice on 3/12/02. Patient was placed on 24-hour CHC on 3/26/02 because of cancer and was visited by relator on 3/30/02 at the nursing home. Patient did not appear to be in any acute distress or to need any direct skilled nursing care. The crisis care workers were from different agencies (Omega and Classic Care), and not employed by Vitas. Patient had a foley catheter. According to progress notes, CHC worker took vitals and assisted nursing home staff with changing patient's position. Nursing home staff provided all medications.

(g)     Barbara K. was admitted to hospice on 8/30/01 and placed on CHC on 2/19/02 because of a need for "dressing change" that was in fact performed by the nursing home staff. Relator visited on 2/24/02, and was told by CNA (from Classic Care) that no one was at bedside when she arrived at 8:00 a.m., and nursing home staff advised that there was no one in room when they arrived at 6:30 a.m. (According to the sign in sheet, the LPN on duty the night before had left before the end of her shift, and it appears that before she left she made entries on the progress notes for 6:30 a.m. and 8:00 a.m.). Relator was advised that this had been the case on the preceding Saturday and Sunday. Relator called Vitas and notified a supervisor, Sandy Norton, of fact that LPN was

16

leaving early and she sent the sign-in sheet (which confirmed that no one was with the patient). Neither Vitas nor Ms. Norton returned her call. According to the progress notes, the care provided was limited to vitals taken and repositioned, foley catheter emptied. Nursing home staff provided all medications.

(h)     Dorothy L. was admitted to hospice on 4/05/02 and CHC was to start on 4/06/02 for cerebral vascular accident (stroke) and dementia. However, Vitas was unable to staff with an RN or LPN so relator was sent to visit the patient on 4/07/02 to "please" the nursing home and to tell them that as soon as they could find someone to send, they would. According to progress notes, CHC worker was to provide turning and repositioning and take vitals. Medicaid paid for stay. Medicare paid for CHC.

(i)     Jean P. was admitted to hospice on 2/12/02; CHC started on 2/15/02 with Stage II decubiti (a pressure ulcer), and visited by relator on 2/24/02. There was no need for crisis nursing care. According to progress notes, care given patient was to reposition, change diaper, take vitals, and monitor oxygen therapy. All medications were given by nursing home staff and the dressing was changed once or twice a day, usually by nursing home staff.

(j)     Margaret R. was admitted to hospice on 2/21/02 with end-stage colon cancer, was immediately started on CHC, and when she was visited by relator on 3/17/02, she was on still on CHC. At the time of relator's visit, patient was living at home with her husband and two daughters. Relator did not observe patient experiencing any acute medical symptoms, nor did she observe patient to be in a period of "crisis" which would reasonably have required continuous care to achieve palliation. According to the progress notes, the crisis care worker changed Margaret's diaper, took her vitals, emptied her foley bag, and sat at her bedside. All medicine was administered by her daughters, and not the crisis care worker. Relator personally observed the CHC workers' sign-in sheets, which indicated that crisis care workers had been present but that no crisis nursing care was provided.

(k)     Leo S. was admitted to hospice on 3/19/02. Patient had been placed on CHC on a number of occasions, most recently on 4/19/02 with diagnosis of "failure to thrive" and need for dressing changes. Relator visited on 4/21/02 and found the patient awake and alert and in need of minor coaching to increase his caloric intake. Patient was able to feed himself. The dressing change was for a very small wound on his right foot, the size of a pinhead. He had a bunion removed a few weeks earlier. The dressing was changed once a day. Progress notes indicated that worker took vitals, changed diaper as needed, and assisted with meals. Relator made second visit on 5/12/02 and learned that patient was taken off CHC for two weeks, but placed back on CHC on 5/07/02 for Stage II

pressure ulcer. Patient was still on CHC. The dressing was changed one time daily. According to the progress notes, CHC worker took vitals, diaper change as needed, and assisted with meals.

(l)    Edith W. was admitted to hospice on 2/08/01 and was visited by relator around 1/23/02. When relator returned to nursing home on 1/25/02 to see another patient she was asked if she was the CHC worker sent by Vitas for Edith W. for "low pulse." Edith W. was not in need of continuous home care to achieve palliation. Nor did she have any acute medical symptoms that required continuous pain management.

(m)    Marie Z. was admitted to hospice 10/30/01 and visited by relator at home on 2/24/02. At the time, patient had been on CHC for more than a week due to respiratory distress. However, relator found no need for CHC. The care was provided by agency staff (not Vitas employees), and included repositioning, bed baths, taking vitals, and monitoring vitals. Patient's family gave all medications.

(n)    Catherine U. was placed on continuous home care due to decreased/loss of consciousness and respiratory distress. The chart indicated that she received no skilled services and the nursing home staff administered medications. Chart further indicated that there was a routine 12-hour shift split between RN/LPNs on the night shift and CNAs on the day shift and progress note entries were not recorded on hourly basis.

66. A review of the above patient information specifically reveals the following material

issues with the patients' alleged need for, and Vitas' alleged provision of, continuous home care:

(a)    The physician order form regarding the need for continuous home care was either missing from the file or did not provide a diagnosis that justified continuous home care. *See* Earline A. (end-stage congestive heart failure), Eleanor B. (was placed on continuous home care because of need for oral antibiotic and a "pin size" leg wound; continuous care order called for "oral care as needed, head of bed elevated, keep resident clean and dry, turn and reposition  vital every shift"), Lorena B. (single seizure), Vivian C. (vomiting), Betty H. (change in level of consciousness), Martha J. (cancer diagnosis),  Barbara K (need for dressing change), Dorothy L. (stroke and dementia),  Jean P. (stage 2 pressure ulcer), Margaret R. (end-stage colon cancer), Leo S. ("failure to thrive" and on second occasion, for pressure ulcer), and Edith W. ("low pulse").

(b)    The recorded symptoms did not justify continuous home care and/or the patient was not in any acute distress (*i.e.*, a "period of crisis") that required continuous nursing care at the time relator arrived. *See* Earline A. (decreased urine output, decreased appetite, weakness, sob, edema

LE, chest pain), Eleanor B., Lorena B., Vivian C., Betty H. (patient had been non-verbal and essentially unresponsive for more than one year), Martha J., Barbara K., Dorothy L., Jean P. (pressure ulcer), Margaret R., Leo S., Edith W. ("low pulse"), and Marie Z.

(c)     The continuous care employee's progress notes did not document the administration of services that constitute continuous care but instead reflected the provision of services that qualify as less expensive routine home care. *See* Eleanor B. (no medications given or dressing changed), Lorena B. (took vitals, repositioned, assisted with feeding), Vivian C. (continuous home care worker took vitals, turned and repositioned and fed patient), Betty H. (continuous home care worker took vitals, turned and repositioned and fed patient), Martha J. (took vitals and assisted nursing home staff with changing patient's position), Barbara K. (vitals taken and repositioned, foley catheter emptied), Dorothy L. (repositioning and turning), Jean P. (reposition, change diaper, take vitals, monitor oxygen therapy), Margaret R. (changed diaper, took vitals, emptied foley bag, sat by bedside), Leo S. (dressing changed, take vital, diaper change as needed, assisted with meals), Marie Z. (personal care). Furthermore, these progress notes were rarely (if ever) recorded on an hourly basis as required by Vitas. *See* Jean P. and Catherine U.

(d)     According to relator's observations, the continuous care logs or sign-in sheets, and relator's interviews with family or nursing home staff, there was no Vitas employee in attendance (Eleanor B.) and/or there were 24-hour periods when no RNs or LPNs were in attendance. *See* Earline A., Lorena B. (no RN for three days), Barbara K., and Jean P. (nursing home staff administered all medications and usually changed dressings). On a number of occasions, the scheduled RN/LPN had left prior to the end of the shift. *See* Barbara K.

(e)     There was an inexplicable pattern of RNs and LPNs being on duty during the night shift and a CNA on duty during the day shift. *See* Barbara K. and Catherine U. (continuous care logs). This is significant because it demonstrates that Vitas scheduled personnel in advance (RN or LPN during the night, with CNAs or homemakers during the day), despite the fact that it would not be possible to determine ahead of time those periods of the day (such as the daytime) where an RN or LPN's services would be required to "achieve palliation" and manage "acute medical symptoms," as opposed to those periods (such as the nighttime) where only a CNA or homemaker's services were necessary. In other words, Vitas utilized this scheduling (in concert with short RN or LPN visits to a CNA or homemaker during their 12-hour shift) to ensure that slightly more than 50% of services were provided by an RN or LPN and therefore the *entire* 24-hour period could be billed under continuous home care, despite the fact that no such treatment was actually required or provided. Indeed, on those occasions that relator was the weekend

daytime RN "on call" (from 7:00 a.m. to 7:00 p.m.), when CNAs were generally on duty, she never once was called to respond to a crisis situation or to administer crisis nursing care.

(f)     The patient was on continuous home care for more than 72 hours and as many as 24 days. *See* Lorena B. (four weeks), Margaret R. (24 days), Jean P. (nine days), Marie Z. (more than one week), Betty H. (one week), Earline A. (six days), Leo S. (five days), and Eleanor B. (three days). Furthermore, all of the patients relator saw were on continuous home care for at least 24 hours.

(g)     The "crisis care" worker who was at the patient's bedside was usually a CNA or homemaker and not an RN or LPN as required by the governing regulations and was not providing any nursing care. *See* Martha J., Barbara K., and Marie Z. Moreover, the aide was often an employee of another agency and not Vitas (some of the agencies providing staffing for Vitas' patients, *e.g.,* Omega and Clasicare, only provided non-skilled workers). In fact, Vitas routinely used personnel (including RNs and LPNs) from outside agencies to meet its continuous home care needs. A comparison of a Vitas employee roster and the progress notes and the continuous care logs for three patients -- Jean P., Catherine U., and Barbara K. -- show that of seven, seven, and five continuous home care workers who signed in, respectively, three (43%), four (57%), and four (80%) were not Vitas employees.

67. After many of her visits, relator left messages for her supervisors, including Edith Ranson and Sandy Norton, stating that she felt her patient did not belong on continuous home care. Neither Ms. Ranson or Ms. Norton, or any other Vitas representative, ever responded to her messages. Relator is not aware of a single occasion on which in response to her call Vitas engaged in any discussion or analysis of the patient's condition, let alone took the patient in question off continuous home care.

68. After witnessing what she believed to be an ongoing pattern of fraudulent billing the government for continuous home care that was neither warranted nor provided in accordance with Medicare regulations, relator notified appropriate governmental authorities of her concerns in March 2002.

69. In December 2006, relator once again notified governmental authorities to the ongoing fraud being committed by defendants.

20

<u>Vitas' False Claims</u>

70. Based on the above facts and direct observations, Vitas has billed Medicare and Medicaid for continuous home care when: (a) that level of care is not warranted because there is no "period of crisis...in which the individual requires continuous home care to achieve palliation and management of acute medical symptoms" (42 C.F.R. §418.204(a)); and/or (b) the services provided do not qualify as continuous home care because they do not consist of eight or more hours of care comprised predominately of nursing care provided by an RN or LPN. *Id.,* §418.302(b)(2).

71. Additionally, in order to obtain reimbursement from Medicare for all continuous home care services purportedly provided, Vitas submitted HCFA-1450 forms that stated that the "information submitted as part of this claim is true, accurate and complete, and, the services shown on this form were medically indicated and necessary for the health of the patient." Each submission of this form was false because it concealed the material fact that the patients were neither in need of, or provided with, continuous home care services.

72. Vitas has certified continuous home care patients as being in need of such services with actual knowledge, deliberate indifference, or reckless disregard of the fact that such services were not warranted.

<u>Evidence Demonstrating that Vitas Engages in System-Wide Fraud</u>

73. These practices are not limited to Vitas' operations in Illinois but are Vitas' national operating policy.

74.  Lisa Salmons, a Vitas general manager, stated during relator's training that Vitas follows a nationwide policy of making continuous home care more readily available than other hospice providers.  Vitas uses this practice in its recruitment of patients throughout its system.

75.  National data confirms that Vitas bills for dramatically more continuous home care than the rest of the industry, nationwide.

76.  Between 2004 and 2010, Vitas billed and received payments of between $458.2 million and $925.8 million, annually, of which between $78.6 million and $153 million was for continuous home care.

77.  The percentage of days of service for continuous home care provided by Vitas and the percentage of its revenues derived from continuous home care far exceed the national average.  For the period 2004 through 2010, Vitas' percentage of days of service for continuous home care ranged from 4.42% to 5.25%, while the national average ranged from 0.4% to 1.2%.

78.  Additionally, during this time Vitas' net revenue for continuous home care as a percentage of *total* revenue averaged between 15.3% and 17.2%, while the net continuous home care revenue from Medicare as a percentage of total hospice revenues nationwide during the period 2003 through 2005 (the last years for which relator has data) ranged from 1.6% to 1.8%.

79.  The above data likely undercounts the extent of Vitas' fraud since these national figures include data from Vitas, who is by far the largest provider of continuous home care and bills twice as many days as all other hospice providers combined.  As a result, the actual figures regarding the provision of, and revenues generated by, continuous home care by hospice-providers other than Vitas is likely even lower than those referenced herein.

80.  The following chart summarizes this information:

| Year | % days of service for CHC -- national avg. | % days of service for CHC – Vitas | Vitas total revenue | Vitas revenue for CHC and as % of total revenue | Revenue from Medicare for CHC as % of total Medicare revenue (nat'l) |
|---|---|---|---|---|---|
| 2003 | **** | 4.90% | $443.124m (est.) | $ 71.343m (16.1%) | 1.6% |
| 2004 | 1.0% | 5.25% | $458.267m | $ 78.669m (17.2%) | 1.7% |
| 2005 | 0.5% | 5.11% | $618.633m | $106.41m (16.9%) | 1.8% |
| 2006 | 0.4% | 5.14% | $699.092m | $121.09m (17.2%) | |
| 2007 | 0.9% | 4.46% | $755.426m | $115.80m (15.3%) | |
| 2008 | 1.0% | 4.42% | $808.445m | $124.89m (15.3%) | |
| 2009 | 1.0% | 4.70% | $854.036m | $141.27m (16.5%) | |
| 2010 | 1.2% | 4.69% | $925.810m | $153.05m (16.6%) | |

81.  This data indicates that Vitas' percentage days of service for continuous home care runs between 3.7 and 13.1 times the national average.  Indeed, during the period 2004 to 2010, the national average was 0.86% compared with Vitas' average of 4.82%.

82.  Thus, Vitas' continuous home care billings run approximately 5.6 times what would be expected if its continuous home care figures were in line with the national average during this period.  This translates to continuous home care billings by Vitas during the 2004-2010 period that exceed what would be expected by approximately $691 million, or 82% of Vitas' revenues for continuous home care during the period.

83.  Between 2003 and 2010, over 90% (and as much as 96%) of Vitas' revenues were derived through Medicare and Medicaid reimbursement programs.

Count I: False Claims Act, 31 U.S.C. § 3729 *et seq.*

84.  Relator incorporates each of the paragraphs in this complaint as though fully set forth herein.

85.  As set forth above, defendants, by and through their divisions, subsidiaries, affiliates, officers, agents, and employees, knowingly presented, or caused to be presented, to officers,

agents, or employees of the United States of America, false claims for payment or approval in violation of 31 U.S.C. §3729(a)(1) and 31 U.S.C. §3729(a)(1)(A) (2009).

86. By virtue of the acts described above, defendants, by and through their divisions, subsidiaries, affiliates, officers, agents, and employees, knowingly made, used, or caused to be made or used, material false records or statements to get false claims paid or approved by the United States of America in violation of 31 U.S.C. §3729(a)(2) and 31 U.S.C. §3729(a)(1)(B) (2009).

87. Defendants acted knowingly, by possessing actual knowledge or acting in deliberate ignorance or reckless disregard of the false or fraudulent nature these claims, records, or statements.

88. As a result of defendants' conduct, the United States of America suffered damages.

Count II: Illinois Whistleblower Reward and Protection Act, 740 ILCS §175 *et seq.*

89. Relator incorporates each of the paragraphs in this complaint as though fully set forth herein.

90. As set forth above, defendants, by and through their divisions, subsidiaries, affiliates, officers, agents, and employees, knowingly presented, or caused to be presented, to officers, agents, or employees of the State of Illinois, false claims for payment or approval in violation of 740 ILCS §175/3(a)(1) and 740 ILCS §175/3(a)(1)(A) (2010).

91. By virtue of the acts described above, defendants, by and through their divisions, subsidiaries, affiliates, officers, agents, and employees, knowingly made, used, or caused to be made or used, material false records or statements to get false claims paid or approved by the State of Illinois in violation of 740 ILCS §175/3(a)(2) and 740 ILCS §175/3(a)(1)(B) (2010).

92.  Defendants acted knowingly, by possessing actual knowledge or acting in deliberate ignorance or reckless disregard of the false or fraudulent nature of these claims, records, or statements.

93.  As a result of defendants' conduct, the State of Illinois suffered damages.

WHEREFORE, Laura Spottiswood, on behalf of herself and on behalf of the United States of America and the State of Illinois, prays that:

(1)  this Court enter judgment against defendants in an amount equal to three times the amount of damages the United States of America and the State of Illinois has sustained, plus a civil penalty of $11,000 for each violation of 31 U.S.C. §3729 and $11,000 for each violation of 740 ILCS §175;

(2)  relator be awarded the maximum amount allowed pursuant to 31 U.S.C. §3730(d) and 740 ILCS §175/4(d);

(3)  relator be awarded all reasonable attorneys' fees, costs, and expenses;

(4)  this Court award prejudgment and post-judgment interest; and

(5)  the United States, State of Illinois and relator receive all other relief, both at law and at equity, to which they are entitled.

Respectfully submitted,


/s/ Judson H. Miner
Judson H. Miner
One of the Attorneys for Plaintiff-Relator


Miner, Barnhill & Galland, P.C.
14 W. Erie St.
Chicago, IL 60654
(312) 751-1170

Law Offices of Sidney R. Berger
233 S. Wacker Dr.
Chicago, IL 60606
(312) 558-6730

## CERTIFICATE OF SERVICE

Lisa Mecca Davis certifies that she caused a copy of the foregoing Amended Complaint to be served upon all counsel of record, by this Court's electronic-filing system, this 12th day of November, 2012.

/s/ Lisa Mecca Davis
Lisa Mecca Davis